The calendar today is Allenback v. Corelogic Credco LLC and we'll give just a moment for the lawyers to be able to take their places and the courtroom to settle. I don't think that's a good case in the background, I think. Oh, yeah. I think I'm only as far back as you. All right, we'll hear first from Mr. Zemel. Please let me know if I have mispronounced your name and I'll try to correct that. May it please the Court, my name is Daniel Zemel. I represent Appellant Aimee Allenback. I'd like to begin by addressing the District Court's summary judgment opinion. One of the key issues in this case is which credit report did Credco provide to Caliber? During the course of Ms. Allenback's case. I'm sorry to interrupt, but since you started there, and I think that's the right place to start, the question that I have is because which credit report was provided is so central to this case, why didn't Ms. Allenback conduct discovery on Caliber? In other words, why didn't Ms. Allenback try to obtain a copy of whatever report was provided? When Ms. Allenback requested of Caliber to provide her with that report, they directed her to Credco. Creditors don't provide those reports to consumers upon request. The FCRA states you can go to the issuing credit agency, Credco, and ask for a copy of that report. She did that the very same day that she applied and was denied for credit with Caliber. Right. But in federal litigation, you can engage in discovery tactics like document requests, interrogatories, et cetera. Yes. I think your question is why didn't we send document requests or items to Caliber themselves? Right. Okay. Because it's your client's burden. That's the issue. Yes, Your Honor. The reason is when we got the production, it seemed clear to us that we were all on the same page about which credit report was issued to Caliber. Once we got to the deposition, I know counsel during the course of the litigation disagreed, but the documents spoke for themselves. They showed the credit reports sent to Caliber. The responses to Ms. Allenback's disputes, her requests for a copy of that report provided her with the very report they gave to Caliber. So from our perspective, they had already admitted what they gave, and it wasn't an unknown question. At the deposition, it became clear that they had a different view of the facts. At that point, we had, I think, less than 30 days to conduct discovery. We didn't have time to issue a subpoena to Caliber, but in retrospect, we should have. However, the burden is on the defendant at summary judgment, and they didn't satisfy their burden here. But it's, but you do have to show more than a scintilla of evidence, and they did come forward with evidence in the form of declarations saying that the record that they provided to Caliber did not have the information in it. So that's where the problem is, right? The burden is on you to be able to rebut that, or at least to make it into a material question, a material dispute. I believe there's much more than a scintilla of evidence here. First, we have Ms. Allenbeck's testimony of what Caliber represented to her. That's hearsay testimony, though. It's hearsay. And we presented to the district court that we can provide that in admissible form at trial when we bring Caliber in to corroborate that testimony. But no, the law says that you have to bring the person who made the statement. I mean, it's generally, that's what's required. And that person you could not identify, and therefore, that person you could not produce. The statements made to Ms. Caliber were done in a corporate capacity. Because of that, the case law is clear. A corporate representative without a specific person but a corporation can speak about actions that were conducted in the course of business. But how would they possibly know what a particular phone rep said in a particular call if they don't even know who that phone rep was? When someone applies for credit, gets denied, there's, in every case, there are, it is documented. It's not, hopefully we'll find some employee. These are business records that they could testify to. When you say these are business records, what records are you talking about? The records of what credit report they provided? The reasons for the credit denial? This is all documented by the creditor. But that's not what you're talking about. You're talking about testimony about what someone said to her on the phone. It's, yes, but the reason for that is when someone, it's not a, a credit application isn't a phone call. When you call, when you apply for credit, they run your report, they get an underwriting decision and they get a denial letter. All of that's documented. No, I mean, I understand that, but that, that means, I think, that what you're saying is you can prove your claim even without testimony about what your client heard on the phone. Is that correct? Certainly. Okay. So, but a minute ago you said that you would have evidence of what your client heard on the phone and that that would come from the 30B6 representative.  So, I guess I'm confused about which one you're going with here. Yes. It's not just that our expectation is we'll call Caliber in and they'll say what they told Ms. Allenbach on the phone. It's we'll call Caliber in and they'll describe what happened during the process and why she was denied. That will corroborate the hearsay testimony of Ms. Allenbach in admissible form. That's how we argue to the district court. I'm not sure that, well, that would be a district court decision. I'm not sure that that would be the same. I'm not sure that corroborates the hearsay testimony, but I suppose if you did have a corporate representative testify that the wrong document was provided and that's why the credit didn't go through, then that would be a win, but I don't think we've got evidence that that's what's going to happen. And I guess maybe I'll just add that you're pondering is what I'm hearing from you is that the evidence you wanted to introduce, you had other means of doing, so why are we even debating this evidentiary ruling? Well, there were a number of ways to prove our claim. Like Your Honor said, there's more than a scintilla here. There are three, even with Caliber aside, as I stated in the brief, there were three party admissions about which credit report was provided to Caliber. The first party admission is what they provided in response to Ms. Allenbach's specific request. She called them in October of 2020 and said, provide me a copy of the report you sent to  In Exhibit A, of Defendant's Exhibit A in the summary judgment, on page ECF42-1, on page ECF26. It clearly says, in response to your request, here is the attached report. That was a party admission. That's more than a scintilla of evidence. There are two other critical party admissions. During, Credco also testified, when she called them the same day of that credit denial, the only credit report they could find that Credco transmitted to Caliber was Exhibit A. This is the credit reported issue. The Defendant contends it was Exhibit B that was provided, but we have two party admissions so far that it was Exhibit A. There's another third party, there's another party admission that the panel should consider, too. In Defendant's summary judgment Exhibit J, their response to Ms. Allenbach's disputes, they state what happened after, in January 2021, what happened in handling the November disputes. The TransUnion reporting was deleted. Obviously, if TransUnion deleted the accounts in 2020, they were on there at the time she applied for credit in 2020. It doesn't, let me be clear, if I were her, when I received, first of all, the loan rejection and second of all, the kind of document from your friends on the other side, I would have been really upset and would have thought that the wrong document had been given. But I mean, I would have, right? But it seems that the evidence shows, the evidence that was developed shows that that was not the document that was actually provided. And I'm still not sure how you've shown that it was as opposed to that it really seemed like it was when that happened and was very upsetting. I just went through two party admissions, two direct defendant's admissions stating this wrong report is the report they provided to Caliber. And I'm getting into the third party admission. And tell me who you said, tell me who you say said exactly that. The defendant. Right, but who, the 30B6 or someone else? Document production. Exhibit A, the document themselves say, here is the document, this is the credit report in response to your request when she had requested which report they gave to Caliber. Also the corporate representative in, we cited in our brief, they testified in the affidavit that the only report they could find sent to Caliber during that phone call was Exhibit A, the one at issue. And the third document from the defendant are the dispute results. I went through the transunion results. The Experian results are also telling. The Experian reporting shows that it was unchanged. Credco provided an explanation of how to read their results. At Exhibit J on page 2, it says, if disputed information has not been changed, the applicable bureaus verified it. Verified it in credit reporting is a term of art. It means those trade lines were on the report and will continue to be on the report. This is a third-party admission. The district court disregarded and improperly weighed this evidence, and it's counter to what the defendant's representations are concerning which credit report was sent to Credco. Ms. Allenback also, like I stated in my brief, the whole gravamen of this case is when she applied for credit and they told her these erroneous accounts are there, she started to go to Credco. She had never heard of Credco before or thought these accounts from 2016 would be on her 2020 report. I'd like to focus next on the other claim and the other error of the district court, which is that every FCRA claim requires an inaccuracy. Specifically, Ms. Allenback brought claims under 1681ID, the disclosure sections of the FCRA. These claims plainly do not require an inaccuracy when looking at the plain language of the text as well as prior rulings of this court. The specific language of the statute says a disclosure is required whenever there is an inaccuracy or when information cannot be verified or when information is disputed. Under the plain language, the disclosure requirements of the FCRA, therefore, do not require an inaccuracy. The district court erred in dismissing those claims by imposing an accuracy requirement on this ID section of the statute. Are you saying that there's an inaccuracy anyway, though? Yes. There is certainly an inaccuracy, but there are different components of the claim. We brought a number of subsections in this claim. Just a quick question on the class certification. What is your best case for your argument, assuming you're proceeding with the argument, that a motion for class certification is a dispositive motion? I think we had some Fourth Circuit law on that. We cited a lot of cases. The district court cited a lot of cases, too, for the proposition that a motion for class certification is not dispositive. It doesn't resolve the whole case or really even part of the case, given that your client can proceed individually. So just, I guess, remind me then, what is the best case for me to really look to? It's in my brief. It's not about whether we got it right or wrong. It's that there's ample case law saying it is a dispositive. So even if we were wrong, it wasn't an inexcusable neglect. We know the other case law. You can check, if you want, while we're waiting for you to come back up for rebuttal. You've got three minutes for that reserved. In the meantime, we'll hear from Mr. St. George. Thank you, Your Honor. May it please the Court, Timothy St. George, counsel for the appellee, CoreLogic-Credco. Your Honor, we can start with summary judgment as well. The district court properly granted summary judgment on the undisputed record that there was no inaccuracy in the 2020 Credco report. It based that decision on the documents that were provided, the sworn testimony, confirming the contents of those documents, and all of the other indicia on those documents showing when they were issued and what they reflect. I have some questions about those documents. The dispute closure letter, for example, which Mr. Zemel was referring to, I had also noticed that it says, results TUC deleted. And I wonder why that is, given that this is dated 2020. Why would we see TUC deleted if, in fact, that hadn't been done? So I think the answer lies in the fact that this is generally a form letter, but I think the real answer, Your Honor, to the substance of what happened, you can look at TU's actual reinvestigation results and what they communicate to CoreLogic-Credco. In TransUnion's reinvestigation results, which are the impetus for the letter from Credco to Ms. Allenback, says, quote, the information disputed does not currently appear on his or her TransUnion credit report. TransUnion is confirming that this information is not there. It was there, of course, in 2016. At some point, it was deleted from her account, which we know happened as a result of some litigation that she filed against the bureaus. But TransUnion is also affirming this information is not there in 2020. It was previously deleted at some point in time, and that's what Credco reconveys to Ms. Allenback in its dispute response letter. In terms of the content of the documents, this is not a case involving competing circumstantial evidence or anything in that regard. It's a documented report, time stamped, date stamped, and authenticated by testimony as to exactly what went to Caliber. And that document itself does not contain the disputed USAA or Auckland reports, which makes sense because they were deleted in 2017 in response to litigation. There's also undisputed, unrefuted proof in the record from Ms. Angela Bernard, the corporate representative, that CoreLogic does not reissue prior reports. These are system-to-system transfers. This is an electronic process. And CoreLogic, Credco, through its whole business model, obtains your current credit profile at the time of a request and then transmits that to a potential letter. This is instantaneous. It's contemporaneous. You can understand why that might be less convincing to Ms. Allenback when she received an old credit report when she asked for it, right? There's no question here that there was an unfortunate mix-up in terms of what Ms. Allenback was sent. It's been fully explained as to why. The 2020 report was a soft pull. It did not retrieve credit information using her Social Security number. The agent who fielded her call on the phone input her Social Security number, which brought up the 2016 hard pull report, which did use her Social Security number. Can you explain that to me? And I apologize, but you said it didn't use her Social Security number, but then you say that the agent used her Social Security number to pull it up. What is the, there's clearly some kind of a difference here. What is the difference? So, the explanation for that is when Ms. Allenback calls in as part of the authentication process, they received her Social Security number to validate her identity. That's what the agent plugged into its system in order to look for the prior report. And that only pulled up the 2016 report because that was the only other hard pull. But what does it mean then to pull a credit report by Social Security number? So, it simply means the fact that when they were conveying this information to the bureaus in order to receive the information in that hard pull context, the bureaus would have received her Social Security number. That Social Security number was provided only in 2016 because that was the hard pull. In the soft pull context, that simply doesn't happen. It's not going to, it doesn't use the same identifiers in order to pull the report, which is why when looking internally in our systems in 2020 to respond to Ms. Allenback's request for a file, she only received a copy of the 2020 report. Why wouldn't there be one pull, right? And why would the, why would the more specific information lead to the less current report? Well, the more specific, I'm sorry. In terms of the Social Security number. Right, the Social Security number seems to me to be more specific than her name. Yes. So, I would think that if I gave my Social Security number, I would receive whatever the gold standard newest report was, but it sounds like that's not true. It sounds like you get whatever old happens to be in the system from the last time someone used your Social Security number. So I don't think there's any dispute that this process on CoreLogic's end in fielding her call did not work as intended. She should have been able to get a copy of her 2020 report at that time. Based on the identifiers provided, it should have been linked together in CoreLogic's system. This was simply an error in processing the request. Do you know if the system has been updated internally as a result of this problem? So, I don't think there's been any system updates because I don't think there was actually a need for system updates. I think that this was an operational error in being able to link the two reports to Ms. Allen back at the time that she called in. That doesn't mean there's an FCRA claim, of course. I'm not hearing about an error, though. I'm hearing about the way the system works. Right. So, the systems work when she provides the identifiers that are requested by CoreLogic Credco. The reports, all of the reports that match those identifiers should have populated, but this agent was simply searching just by social security number. It seems that she selected the wrong report to send back to her because she was just searching by social security number. Now, of course, the content of the reports doesn't change in terms of what's sent to Caliber in 2016 and what's sent to Caliber in 2020. Again, everything's all timestamped, dates stamped, validated by how our systems work, and the content speaks for themselves. So, here, I think for myself that that's likely what the evidence shows. But what if Caliber had used her social security? Would it have gotten the old report, too? No, because the undisputed evidence is that CoreLogic did it. No, no, I'm not asking did it. I'm asking if it had made the request using the same information that she used on the phone, would the company seeking her credit report also have gotten an old, less accurate report? It would not. So, why not? Because the testimony from Ms. Barnard and the declaration supporting summary judgment is that CoreLogic Credco systems work by never selling historical reports. Once those reports go over the transom, they are obsolete from CoreLogic's perspective because they will never reflect the then-existing credit profile, which is what CoreLogic transmits. You will always get the point-in-time report from CoreLogic Credco. Old reports will never be retransmitted. But old reports can be retransmitted to customers? Not to customers. Well, not to customers, to individuals.  Like Ms. Allenback. If they call up and they ask for a copy of what's reported, they will receive a copy of their report. But a customer will never receive an outdated version of the report. I have a few questions for you. So, Credco provided an inaccurate copy or an inaccurate credit report to Ms. Allenback when she asked for it in 2020, right? Right. Not an inaccurate credit report, but the credit report from 2016 when she asked for her most recent report, but yes. Was that a violation of FCRA Section 1681G? So there was no Section 1681G claim pled in the complaint, so it's just not a live issue in this case. Okay, but was it? I think that if a consumer calls in and asks for a copy of a specific report, that's not necessarily the same thing as a consumer asking for a copy of his or her file. Speaking purely hypothetically, it should have happened. She should have received the 2020 report. There's no dispute about that. I don't think I would say it is, because she's only requesting a specific report, not her full file. In any event, it's what should have happened, but that claim's never pled in the case. All right. Let me ask you about Caliber, because it looks to me like you included them in your initial disclosures as a witness. Is that right? So we included, generically, the notation of Caliber as a witness, corporate witness who may have information regarding her loan application, correct? But you didn't provide any evidence from Caliber. Why is that? So we didn't take evidence from Caliber, A, because it's not our burden, B, we didn't have to take evidence. Well, it is your burden on summary judgment, though, to show that there's no material disputed fact over... Sure. We're absolutely able to prove that through our own systems, our own systems of record in terms of exactly what went to Caliber. We're also able to point to the absence of evidence. I mean, it would have made it just so easy and clear to the courts if we had heard from Caliber what Caliber received. I mean, wouldn't that have been the easiest way to resolve this? There's no dispute on this point. We are able to tell directly from our systems what Caliber received, and it's already been testified to. Well, that's what you say, right? That's what you say. And their argument is, well, we can't really trust what Credco says, because when we asked for the report, we got the 2016 report. And obviously, you have explained that, but they're contesting that. And they say, you kind of admitted two times that you provided the 2016 report. So that's where the whole crux of the issue is, what exactly was provided. It would have just cleared everything up had somebody gone to Caliber and obtained that information. So it's, again, we don't need to go to a third party to determine what we told to the third party. To the extent they want to create a dispute of fact on that point, it's their burden to go to the third party to actually get evidence to dispute that fact, which is undisputed in the record. We've already explained these admissions in the form of the TransUnion response or why she got the 2016 report. They're not admissions. They're explained. And the documents, again, speak for themselves. In any concept that Caliber could have come in, some unidentified, unknown witness, we don't know if that witness is alive. We don't know if that witness is in the subpoena power of the court. That question is properly posed to the party with the burden of proof because we're able to prove everything about how our systems work. But if it's a system to system transfer, as you've said several times, what is the difficulty of simply subpoenaing what was in the system at Caliber? I mean, it's a corporate record. It seems like it would have been so easy. It would have been easy for Ms. Allenback to do it and disprove her own case. But again, we didn't need to do it because we have the system document in our possession as our business record in the first instance. I mean, some might say it would have been easy for you to do it and disprove your own case. Again, we don't need to disprove what we can show through our business records affirmatively. My question has to do with the language of the statute, which does speak to maximum possible accuracy. But I'm wondering if that standard is different. You have the accuracy of the documents, which yes, I think there is an argument that what she received, what was within the four corners was accurate. But the response to her request, I think that's the question. Was that accurate? Was that misleading? And so is that not a fair line for me to create or buckets to create? Sure. So our correspondence direct with Ms. Allenback and what was sent to her is by definition not a consumer report. It's not subject to 1681EB. There's ample case law that EB only applies when the transmission is between a company and a third party. So that's the requirement for something to be a consumer report. The fact that there was an operational mix up with what went to Ms. Allenback does not support an EB claim because there's no third party involved in that exchange. Turning briefly, if I may, to the issues about amendment, there's no question that the deadlines came and went, nine and 10 months respectively, before she moved for leave to amend and before she moved for class certification. These deadlines were clear. They were in the scheduling order. They were negotiated and jointly submitted. And there is no justification and there's a distinct lack of diligence for missing them. In terms of any contention that there was confusion that needed to be cleared up before she amended, there was a six-month delay between the time that the documents went over formally in discovery. And again, these were preceded by informal communications informing Ms. Allenback about the error of her ways. A deposition was only requested at the end of the discovery period. That alone shows a distinct lack of diligence. And Your Honors have affirmed, this circuit has affirmed in numerous cases that we've cited, such as the Sosa and the Southern Grout case, that even delay in taking evidence that you feel you need to develop your case is itself reflective of a lack of good cause and diligence. There also would have been distinct prejudice to completely rework this case three business days before the close of discovery in order to assert new claims, new classes, and new facts. That's per se prejudicial. The district court acted well within its discretion in denying leave for amend. In terms of class certification, the failure is equally obvious. Under the Northern District of Florida Local Rule 23.1, class certification is due within a date certain unless that deadline is modified by the court. There were three scheduling submissions, an initial scheduling order, a Rule 26F report, and a final scheduling order, none of which addressed or supplanted or modified in any way that Rule 23.1 deadline to move for class certification. The cases that you asked Mr. Zemel about in terms of whether a class certification motion is dispositive, those are all coming from the context of what motions can be referred to a magistrate judge and the appeal process of a report and recommendation. They are not using the term dispositive in the ordinary parlance of civil litigation. And there's a litany of courts that have had, have considered this type of argument in the typical civil litigation context that we find ourselves in that have found it's a procedural device. It's in no way case dispositive. And I'll also note, Your Honors, something that's never been mentioned by Ms. Allen back in her briefing is in the parties' proposed scheduling submission, their Rule 26F report, they described what constituted dispositive motions for purposes of the case deadline, and they described it as, quote, motions for summary judgment and Dawbert motions. And that was the deadline that was adopted by the district court. There can't be any confusion when it's what the parties proposed to the extent there was any confusion, they could have asked for clarification from the court, but that never happened either. For those reasons.  Sorry, go ahead. That's for, I was going to conclude. For those reasons, we would ask that the court, district court's judgment be affirmed. If you have any further questions, I'm happy to field them. All right. Thank you very much, Mr. St. George. Thank you. And we'll hear again from Mr. Zemel. Thank you. Thank you, Your Honors. To your question, Judge Abudu, the cases are Leggett v. Officer Sean Rollins and Ferguson v. Text Farm Bureau Business Corporation at page 17 of our brief describing that. Thank you. I want to get to your question, Judge Rosenbaum. Isn't this a 1681G violation? The answer is yes. And the answer is we ended up seeking to add that claim. It wasn't in the initial complaint. But we sought to add it once we discovered and got into the facts here. We did not figure this case out from what the defendants were arguing until the deposition. As you heard me articulate before, until that point, we had party admissions and we had conflicting documents. There was conflicting evidence in this case. In fact, all parties were before the magistrate judge to, on a motion to compel, to address some of these issues. And it was agreed by all parties and the magistrate judge. Because of the confusion in these documents, we needed a deposition to figure it out. When we got their story, we then sought leave to amend, I believe it was within two to three weeks after we got that deposition back. With regard to the burden of proof, this is summary judgment. All facts are to be taken in favor of the nonmoving. The defendant has come here and represented. They knew the facts. They've got their stories and it's clear. But we presented counter evidence. The district court here improperly weighed the credibility of the evidence and adopted their version of the facts. Why didn't you ask CoreLogic for their evidence on what they received? From whom? Oh, you mean Craig Coe? I'm sorry. No, no, no, no. I'm sorry.  The lender. The lender. Yes. You're right. I was thinking Craig. Anyway. Why didn't you ask the lender? Again, in retrospect, we should have. But we saw the documents and we understood from what Caliber told Ms. Allenbeck, this is what happened. And the documents supported what they told her. Ms. Allenbeck never heard of Craig Coe until Caliber said, we got this report from Craig Coe. And so we felt it was enough. And frankly, if we needed them at trial, we can bring it. But it's not our burden of proof at summary judgment. We are the non-moving party. It is your burden of proof to establish even a, to establish some evidence about what happened. Yes, Your Honor. I agree. But again, I think we put more than a scintilla of facts here. When we've got three-party admissions, we've got a witness and we've got testimony from the plaintiff herself. Finally, I want to conclude with, even if the panel accepts the fact that the Exhibit B credit report was issued to Caliber instead of Exhibit A, it doesn't require or call for dismissal under 1681i.d. Accuracy, i.d. was violated. Accuracy is not a requirement of that section of the statute under the plain language. Thank you. All right. Thank you, counsel. We'll be in recess until tomorrow. All rise. Thank you.